METROPOLITAN BOARD OF ZONING APPEALS OF MARION COUNTY, INDIANA, DIVISION ONE, The Consolidated City of Indianapolis–Marion County, Indiana, J.C. Hart Company, Inc., Toller Family Associates, LP, and Paul L. Hollcraft, Appellants–Respondents,

v.

Woodrow J. LANE, Elizabeth L. Lane, Woodrow J. Lane Declaration of Trust, Betty J. Lane Declaration of Trust, Larry M. Davidson, Marcia L. Davidson, Thomas Marshall, Elise Marshall, Thomas Banta and Ila Banta, Appellees–Petitioners.

No. 49A02–0204–CV–303.

Court of Appeals of Indiana.

April 24, 2003.

---

Michael C. Cook, John D. Waller, James M. Boyers, Wooden & McLaughlin, Indianapolis, IN, Attorneys for Appellants.

Frank W. Hogan, Voyles, Zahn, Paul, Hogan & Merriman, Indianapolis, IN, Attorney for Appellees.

## OPINION

NAJAM, Judge.

The Metropolitan Board of Zoning Appeals of Marion County ("BZA") approved J.C. Hart Company, Inc.'s ("Hart") petition for a height variance from development standards for apartments on approximately twelve acres in Indianapolis. Woodrow J. Lane, Elizabeth L. Lane, Woodrow J. Lane Declaration of Trust, Betty J. Lane Declaration of Trust, Larry

M. Davidson, Marcia L. Davidson, Thomas Marshall, Elise Marshall, Thomas Banta and Ila Banta ("the Neighbors") then filed a petition for writ of certiorari, declaratory judgment and stay against the BZA and Hart, as well as the owners of the property to be developed, Toller Family Associates, L.P. ("Toller") and Paul L. Hollcraft (collectively "Toller–Hollcraft"). The trial court concluded in relevant part that the BZA's grant of the variance was an abuse of discretion and contrary to law. Hart appeals and raises the following dispositive issues for our review:

1. Whether the trial court erred when it concluded that the BZA's Chairman made statements contrary to law and misinformed the BZA regarding its authority to require commitments in granting variance petitions.

2. Whether the trial court erred when it found that a 1969 Agreement requires Hart to obtain the Neighbors' approval of a planned apartment project.

We reverse.[1]

## FACTS AND PROCEDURAL HISTORY

In 1969 the owners of separate, neighboring parcels of real estate in Perry Township petitioned the Metropolitan Plan Commission of Marion County to rezone approximately 42.65 acres of real estate ("the real estate") from A–2 (single-family dwelling) to D–611 (multi-family dwelling).[2] Two of the petitioner-owners, Paul and Mary Kritsch, planned to sell their parcel, consisting of approximately twenty-five acres, to Laurel Woods Properties ("Laurel Woods") for development of an apart-

ment complex to be named "Les Caribe." The owners of the other parcels within the real estate had no plans to build multi-family dwellings.

While the rezoning petition was pending, Laurel Woods entered into an Agreement, dated November 18, 1969 ("the Agreement"), with owners of parcels neighboring the Kritsches' property. The terms of that Agreement, entitled "Property Owners—Developers Agreement," provide in relevant part:

1. Developers [Laurel Woods] are presently buying under contract of sale certain real estate located in Perry Township, Marion County, Indiana, in order to erect and build an apartment complex said property being more particularly described in Exhibit "A" attached hereto and made a part hereof.

2. The present title holders of the real estate shown in Exhibit "A" have caused to be filed with the Metropolitan Plan Commission of Marion County, Indiana, a petition to have the zoning changed on the above mentioned real estate from A–2 to D–611. (Metropolitan Plan Commission Cause # 69–Z–219).

3. The contract of sale referred to in Paragraph # 1 above is dependent in part upon the securing by the present title holders of a change in zoning to allow the construction of apartments on the subject real estate for the benefit of the Developers.

4. The property owners shall endorse, approve and support the petition [for rezoning to D–611] in return for certain promises made by the developers in relationship to the real estate described in Exhibit "A" attached hereto as follows:

---

1. We deny Appellees' motion for oral argument.

2. Six property owners were named in the petition, but they did not own all of the real estate included in the proposed rezoning.

A. The apartment complex referred to above shall be built according to plans and specifications shown in Exhibit "B" attached hereto. It is acknowledged by all parties hereto that the plans and specifications as shown are general in nature and will be refined in detail at a later date.

B. The plot shall be developed in accordance with the general plot plan attached hereto as Exhibit "C." The landscaping on said property shall be of quality equal to the landscaping on Laurel Lake Apartments. In the easement strip referred to in paragraph 4D supra the developers shall plant white pine trees at least 3 feet tall staggered every twenty-five (25) feet.

C. When the Developers receive title to the land described in Exhibit "A" attached hereto they shall dedicate an area north of the creekbed and in particular all land below the seven hundred thirty-five (735') elevation mark to be used in perpetuity as a park and recreation area only and only for the sole and private use of the tenants of the apartment project, their families and guests and no structures or buildings of any type will be built in this area unless with the prior written approval of the Property Owners.

D. The Developers shall also cause to be given a perpetual easement fifty (50) feet in width by parallel lines along the entire east boundary of the property described above in Exhibit "A." The Developers and/or their assigns shall never attempt to have Tulip Drive and/or Southview Drive extended in a Westerly direction through the subject property described in Exhibit "A." There shall be no structures such as fences (regardless of material used), buildings or shelters erected on said fifty (50) foot easement.

E. Harold Miller and Sarah Miller who are petitioners in the [rezoning] petition ... shall agree to use their access to Southview Drive only for the purposes of a driveway to one single family dwelling on the real estate more particularly described in Exhibit "E" attached hereto and made a part hereof. In addition the Millers agree to fence the south and west lines of the property described in Exhibit "E" to stop traffic from using the path running through their property as a public road.

The Millers are signing this Agreement for the sole purpose of securing their performance of the terms of this paragraph. The terms and conditions of this paragraph as they shall apply to the land described in Exhibit "E" shall attach to said real estate and shall run forever.

The Metropolitan Plan Commission held two hearings on the rezoning petition before recommending to the City–County Council that an Ordinance be adopted rezoning the 42.65 acres to D–611. During those hearings, petitioners' counsel, Henry Coombs, presented the Agreement in support of the rezoning petition. On April 6, 1970, the City–County Council adopted the Ordinance without any reference to the Agreement. The Agreement was not attached to, incorporated in, or recorded with the Ordinance.

In 2000, Hart sought to purchase two parcels of land owned by Toller and Hollcraft, respectively, in order to develop an apartment complex. The Toller–Hollcraft property is located immediately north of the Les Caribe apartment complex and was included in the rezoning ordinance

adopted in 1970.[3] On June 22, 2000, Hart petitioned the BZA for a height variance of seven feet from the D–611 development standards, which provided for a maximum height of 35 feet. Hart's petition did not request any other variance from D–611 standards.

The Neighbors appeared and remonstrated against Hart's petition for a variance. They sought to obtain commitments from Hart that its apartment complex would be compatible with their single-family homes. Specifically, the Neighbors wanted Hart's project to have a dwelling unit density similar to the development features of the Les Caribe complex as set out in the Agreement. But Hart maintained that it sought only a variance from building height restrictions and would otherwise comply with D–611 guidelines.

The BZA held two hearings on Hart's petition. The first hearing resulted in a split vote. Following the second hearing on October 3, 2000, the BZA voted unanimously to grant the height variance.

On November 2, 2000, the Neighbors filed a verified petition for writ of certiorari, declaratory judgment and stay, alleging in relevant part that the BZA's decision was arbitrary and capricious or illegal in several respects; that the 1970 rezoning ordinance permitted only the Les Caribe development to be built, or, in the alternative, that Hart's proposed complex is subject to the 1969 Agreement, or, in the alternative, that Hart's proposed complex is subject to "substantially similar development commitments[;]" and that the trial court should stay all construction pending its resolution of this action. Following a bench trial, the trial court reversed the BZA's decision to grant Hart's variance and issued extensive findings and conclusions, including in relevant part:

[FINDINGS]

11. Hart proposes to build the apartments on the 12.65 acres of Real Estate located immediately east of U.S. 31 and immediately south of Banta Road, at the common address of 699 E. Banta Road, Indianapolis, Indiana. The apartments would be built on a northeast portion of this acreage due to the fact that much of the western portion is within the flood plain of Little Buck Creek. *This is the property to which the [1969] Agreement refers.*

12. The BZA's Rules provide: "If deemed advisable, the Board may require or permit the petitioner to make written commitments concerning the use or development of the subject property." At the first BZA hearing on Hart's height development standards variance request, September 5, 2000, there was no mention of this BZA rule or the BZA being asked to impose commitments on Hart's proposed development. The Board's vote was a 2–2 tie, one member absent.

13. The BZA reheard the case on October 3, 2000, all five members present. During that hearing, the Neighbors' attorney, Mr. Hogan, read the foregoing BZA rule on commitments and asked the BZA to impose meaningful development commitments on any grant of the variance, at least consistent with the Les Caribe project. The Neighbors requested similar density (8 units per acre), 2-story all brick buildings, and suitable buffering between the Hart apartments and Neighbors' homes. Before the vote, the BZA Chairman stated: "We can include these covenants, but if … the petitioner [Hart] doesn't agree to them, we have to vote on what he presents on

---

**3.** The Hollcrafts owned their parcel during the rezoning proceedings in 1969–70, but the Toller property was owned by Loren and Joan Skaats at that time.

his case. So I need to specify that so that the remonstrators understand that we can't just impose conditions. They have to agree to the conditions...."

* * *

[CONCLUSIONS]

12. Under I.C. 36–7–4–921(a), the BZA may "require an owner of a parcel of property to make a written commitment concerning the use or development of that parcel." Commitments are binding upon subsequent owners when recorded or if the subsequent owners have actual notice. I.C. 34–7–4–921 [36–7–4–921](c).

* * *

14. The Agreement is a private agreement to which neither Hollcraft or Toller were parties, and private agreements are generally not "commitments" within the meaning of I.C. 36–7–4–921. *Ogden v. Premier Properties, USA, Inc.* [755 N.E.2d 661 (Ind.Ct.App.2001) ].

15. Nevertheless, the Council adopted the Agreement into the 1970 Ordinance, within its proper discretion. Accordingly, *the Agreement is an enforceable commitment against Hollcraft and Toller as successors. Ogden v. Premier Properties, USA, Inc., supra.* at 667.

16. *Any structure or building on the Real Estate must be approved by the Neighbors and neighboring owners pursuant to the Agreement and Ordinance.*

17. *The Court finds the BZA Chairman's statements are contrary to I.C. 34–7–4–921 [36–7–4–921], and misinformed the board about its discretion regarding pending commitments and new requests.*

18. *The BZA's action granting the variance without considering or enforcing*

*the Agreement is an abuse of discretion and contrary to law.*

(Emphases added). This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: BZA's Authority

 Hart first contends that the trial court erred when it concluded that Chairman Retherford "misinformed the board about its discretion" to require commitments before granting a variance petition. A variance may be described as a dispensation to permit a property owner to use his property in a manner forbidden by the zoning code. *Gary Bd. of Zoning Appeals v. Eldridge*, 774 N.E.2d 579, 581 (Ind.Ct. App.2002). A zoning board has the discretion to approve or deny a variance from the terms of a zoning code. *Id.* When reviewing a decision of a board of zoning appeals, the trial court must determine if the board's decision was incorrect as a matter of law. *Id.* The trial court may not conduct a trial de novo or substitute its decision for that of the board. *Id.* This court's review is governed by the same considerations. *Id.*

 However, where an issue is a pure question of law, our standard does not require deference to the determinations of the BZA, and reversal is appropriate if an error of law is demonstrated. *Hendricks County Bd. of Zoning Appeals v. Barlow*, 656 N.E.2d 481, 483 (Ind.Ct.App.1995). Absent such illegality, this court may not substitute its judgment for that of the BZA. *Id.*

Hart's petition for a variance sought only to increase the maximum allowable height of the buildings in its proposed apartment complex. In response to that petition, the Neighbors remonstrated and urged the BZA to require commitments from Hart that it would incorporate the development guidelines set out in the 1969

Agreement into its project. Board Chairman Retherford addressed that request as follows:

> [W]e can include these covenants, but if they don't—if the petitioner doesn't agree to them, we have to vote on what he presents as his case. So I need to specify that so that the remonstrators understand that we can't just impose conditions. They have to agree to the conditions, and unless we say if you don't do this we're not going to support it. *And we can do that. But if we don't support it, then in your case it goes right back to what it was originally, and that doesn't really help you.* So we're really kind of a—you're in a tougher position, but we're in a tough position to try to make something happen to help your cause, which I'm sure we're sympathetic with. But it's really kind of up to the petitioner to determine what we vote on.

(Emphasis added).

The Neighbors argued to the trial court that Retherford's statements misrepresented the BZA's authority under both the BZA's Rules of Procedure[4] and Indiana Code Section 36–7–4–921. The trial court agreed with the Neighbors and concluded that Retherford's statements were contrary to law and misinformed the BZA about its discretion in considering Hart's petition. We cannot agree.

█ Indiana Code Section 36–7–4–921 provides in relevant part that, in considering a petition for a variance, a board of zoning appeals may permit or require the owner of a parcel of property to make a written commitment concerning the use or

development of that parcel. Contrary to the Neighbors' contention, Retherford explicitly stated that the BZA *could* require commitments from Hart before granting the variance. And a careful reading of Retherford's remarks, taken as a whole, indicates that he was merely pointing out that, under the D–611 guidelines, Hart was already permitted to develop the apartment complex in a manner inconsistent with the Neighbors' wishes, regardless of whether the height variance was granted. In other words, Retherford acknowledged the BZA's authority to require commitments but recognized that to require such commitments from Hart, where only a minor height variance was at stake, would likely be fruitless. We conclude that Retherford did not misrepresent the BZA's authority in considering Hart's petition and that his statements were not contrary to Indiana Code Section 36–7–4–921.[5]

### Issue Two: 1969 Agreement

Hart next contends that the trial court erred when it concluded that the 1969 Agreement between Laurel Woods and neighboring property owners, none of whom are parties to this appeal, applies to Hart's proposed development on the Toller–Hollcraft property. Specifically, Hart maintains that the Agreement is a private covenant that does not apply to the Toller–Hollcraft property and does not involve any of the parties to this appeal. We must agree.

On appeal, we afford special findings by the trial court a two-tier standard of review. *Porter County Bd. of Zoning Appeals v. Bolde*, 530 N.E.2d 1212, 1215 (Ind.

---

4. The Neighbors refer to, but do not provide a citation for, the rule they claim the BZA disregarded. And the Neighbors do not present a separate argument under the BZA Rules of Procedure. As such, we only address this issue under the applicable statute.

5. On appeal, Neighbors make no contention that the BZA's findings in support of granting the variance were unsupported by the evidence. Their sole contention is that the BZA's decision was reversible error since Retherford allegedly misrepresented the BZA's authority.

Ct.App.1988). First, we must determine if the evidence supports the findings, and second, we must determine if the findings support the judgment. *Id.* If we conclude that the findings support the judgment and are not clearly erroneous, the judgment will be affirmed. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a definite and firm conviction that a mistake has been made. *Id.* Regardless, we do not defer to the trial court in reviewing questions of law. *See Haseman v. Orman,* 680 N.E.2d 531, 533 (Ind.1997).

■ Generally, zoning laws which limit the use of real property are strictly construed because they are in derogation of the common law. *Ayers v. Porter County Plan Com'n,* 544 N.E.2d 213, 219 (Ind.Ct. App.1989). Therefore, such ordinances are construed to favor the free use of land and restrictions are not extended by implication. *Id.*

The trial court specifically found that the Agreement "refers" to the Toller–Hollcraft property. But our review of the record indicates that the evidence does not support that finding. First, none of the language in the Agreement expressly refers to the Toller–Hollcraft property.[6] Indeed, the only description of the real estate in the Agreement is by reference to an "Exhibit 'A,'" which the parties have stipulated is missing from the record of the rezoning proceedings. Thus, we look to the language of the Agreement to determine what real estate was described in Exhibit "A."

Both the first and fourth paragraphs of the Agreement indicate that Exhibit "A" included only the Kritsches' parcel. The first paragraph states in relevant part,

"Developers [Laurel Woods] are presently buying under contract of sale certain real estate ... said property being more particularly described in Exhibit 'A'...." Paragraph 4(C) states in relevant part, "When the Developers receive title to the land described in Exhibit 'A'...." The evidence is undisputed that the Developers were only "under contract" to purchase the Kritsches' real estate, not that owned by the Hollcrafts, Skaatses, or any of the other property owners joining in the 1969 rezoning petition. None of the other references to Exhibit "A" in the Agreement contradict our conclusion that Exhibit "A" included only the Kritsches' parcel.

Indeed, in paragraph 4(D) of the Agreement, Laurel Woods promised to grant an easement "fifty (50) feet in width by parallel lines along the *entire east boundary of the property described above in Exhibit 'A.'*" (Emphasis added). Because the Hollcraft–Skaats parcel was located directly north of the Kritsches' parcel, if Exhibit "A" had included both parcels, the "entire east boundary of the property described above in Exhibit 'A'" would have necessarily included portions of the Hollcraft–Skaats parcel. In other words, if Exhibit "A" had depicted more than just the Kritsches' parcel, then Laurel Woods would have been promising to grant an easement on real estate it was not under contract to purchase.

Finally, James Millikan, co-owner of Laurel Woods and a signatory to the Agreement, testified that the Agreement only involved the Kritsches' property. At one point during his deposition, Millikan stated, "Whatever applies to Kritsch's [sic] property is the sum of all our [Laurel Woods'] efforts [in connection with the rezoning and development of Les Caribe]."

---

6. As noted earlier, in 1969, the Toller–Hollcraft parcels were owned by the Skaatses and the Hollcrafts, respectively, and there are no references in the Agreement to them or their real estate.

Millikan's testimony corroborates evidence from the text of the Agreement which indicates that Exhibit "A" described only the Kritsches' real estate, which was to be developed into Les Caribe. As we have already noted, there is nothing in the text of the Agreement to the contrary. As such, we conclude that the evidence does not support the trial court's finding No. 11 that the Agreement "refers" to the Toller–Hollcraft real estate.

Even if the trial court were correct that the Agreement refers to the Toller–Hollcraft real estate, we cannot agree with the trial court's conclusion that the Agreement is "an enforceable commitment against Hollcraft and Toller...." In *Ogden v. Premier Properties, USA, Inc.*, 755 N.E.2d 661, 667 (Ind.Ct.App.2001), this court addressed the difference between covenants and use and development commitments ("UDC"), which are two "'separate species of restriction on the development of real estate....'" (Citation omitted). As we explained:

> While the UDC, attached to a developer's petition, may adequately address the concerns of the governmental body voting on the proposed ordinance, concerns of individual citizens may still exist. Consequently, covenants are often drafted to appease the remonstrators' concerns. While a covenant may impose stricter conditions on the land use, and greater burdens on a developer, its existence is aimed to reduce opposition to the project, which presumably will work to the developer's benefit when presenting the planned rezoning to the governmental body that will vote on the matter.

Not only are covenants and UDCs created differently, but they are also enforced differently. If the requested rezoning is approved, the UDC is attached to, incorporated by, and recorded with the ordinance, and the APC [Area Plan Commission] retains the power to modify, enforce and terminate the UDC. In contrast, a covenant does not become law and is only enforceable by the designated beneficiaries of the restrictions.

*Id.* (citations omitted).

The trial court concluded that "the Council adopted the Agreement into the 1970 Ordinance, within its proper discretion." But, again, the evidence does not support that conclusion. There is no reference to the Agreement in the 1970 Ordinance, and it was not attached to or recorded with the Ordinance.[7] In addition, the minutes to the City–County Council's hearing on the Ordinance are silent regarding the Agreement.

■ Following our analysis in *Ogden,* we conclude that the Agreement is a private covenant that only applies to the original parties to the Agreement and is not a UDC. *See id.* (noting covenant is only enforceable by the designated beneficiaries of the restrictions). The language and history of the Agreement indicate that it was created to "appease the remonstrators' concerns" regarding the Les Caribe development during the 1969–70 rezoning proceedings. *See Ogden,* 755 N.E.2d at 667. Indeed, the neighboring property owners, and not a governmental body, entered into the Agreement due to their obvious concerns that an apartment complex would adversely impact their neigh-

---

7. The Neighbors have not shown that any document was recorded with the Office of the Recorder to suggest that the Agreement ran with the land. Our review of the record indicates that the Agreement was merely introduced as an exhibit at the hearing before the Metropolitan Plan Commission and that it was kept in a file along with other documents concerning the rezoning proceedings.

borhood. *See id.* And, again, the Agreement was never recorded. *See id.*

Nevertheless, the Neighbors maintain that the minutes from the two hearings before the Metropolitan Plan Commission in 1969 [8] support their contention that the Agreement is a UDC.[9] We cannot agree. The minutes from the November 1969 hearing include only a brief reference to Attorney Coombs' presentation of several exhibits, including the "Property Owners—Developer's Agreement." But there is no information in the minutes to suggest whether that agreement was intended as a covenant or a UDC. The December 1969 hearing minutes state:

> Henry M. Coombs, attorney for petitioners in 69–Z–219, stated that at the previous hearing, he had presented *written covenants*, indicating setback lines and easement restrictions, sewer connection agreement and an agreement relative to the low ground, that land below 7[3]5′ elevation would not be used for construction of the apartment project and would be retained for landscaping and park purposes. He stated, in the event the rezoning was approved, that prior to granting any improvement location permits, the site plan would be presented for approval by the Planning staff; and if a change of the site plan was approved by the staff, that it should be reviewed also by the adjacent neighbors; all to be binding upon the petitioner under the Improvement Location Permit Ordinance.

> * * *

> Petition 69–Z–219 was approved and recommended to the Marion County Council for adoption.

(Emphasis added). But this reference to "written covenants," absent any evidence that either the Metropolitan Plan Commission or the City–County Council incorporated the Agreement into the Ordinance, is not sufficient to show that the Agreement was a UDC. And the references to the "site plan" and "the apartment project" support a determination that the Agreement was meant to apply only to the Les Caribe project. As Hart points out, the only site plans found in the record of the 1969 rezoning proceedings show diagrams of the Kritsch/Les Caribe real estate. And, as we have already noted, there were no other proposed apartment projects within the rezoned property at that time.

In sum, the Agreement is a private covenant between Laurel Woods and neighboring property owners, none of whom are parties to this appeal. The Agreement refers exclusively to the former Kritsch real estate and does not apply to Hart's proposed project on the Toller–Hollcraft real estate. The trial court erred when it concluded that the Agreement is an enforceable commitment against Hollcraft and Toller and that "[a]ny structure or building on the Real Estate must be ap-

---

**8.** The transcripts of those proceedings no longer exist.

**9.** The Neighbors also rely on an April 9, 1970 letter from E.H. Franke, the City–County Zoning and Platting Administrator, to Paul Kritsch informing him that the Ordinance had been adopted "subject to the parol covenants on file with this office." The Neighbors assert that this is evidence that the Agreement applies to Hart's project. But the Neighbors do not make any cogent argument in support of this contention. Roughly translated, a "parol covenant" is an oral agreement. The Agreement at issue here was in writing. Further, we do not understand how "parol covenants" could be "on file." In any event, there is no basis in the law to conclude that an oral agreement could constitute either a UDC or a covenant that runs with the land. The Neighbors' contention on this issue is without merit.

proved by the Neighbors and neighboring owners pursuant to the Agreement and Ordinance."

We hold that the BZA did not abuse its discretion or act contrary to law when it declined to enforce the development guidelines contained in the Agreement. We agree with the trial court that there was substantial evidence to support the height variance. The BZA's decision to grant the variance was not an abuse of discretion, and Hart is authorized to proceed with its project in compliance with D–611 development guidelines and the height variance.

Reversed.

DARDEN and VAIDIK, JJ., concur.